## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**ADDISON SALTER,**

        **Plaintiff,**

**v.**                                       **Case No. 3:06cv110/MCR**

**RON McNESBY,**
**in his official capacity as ESCAMBIA COUNTY SHERIFF;**
**TIM TAYLOR, in his individual capacity;**
**and**
**JEREMY JARMAN, in his individual capacity,**

        **Defendants.**

_____/

## O R D E R

In this action plaintiff Addison Salter ("Salter") sues Escambia County Sheriff Ron McNesby ("McNesby") and Escambia County Sheriff's Office ("ECSO") Deputies Tim Taylor ("Taylor") and Jeremy Jarman ("Jarman") pursuant to Title 42 U.S.C. § 1983 and state law.  Presently before the court are motions for summary judgment filed by Jarman and McNesby ("the defendants").[1]  Salter responded to the defendants' motions and, with leave of court, Jarman replied.[2]  Also ripe for disposition at this time are the defendants' motion to strike, their motion for separate trial, and Salter's motion to reconsider an order of the magistrate judge.[3]  For the reasons that follow, the court grants the defendants' motion to strike, denies in part and grants in part the defendants' motions for summary judgment, denies the defendants' motion for separate trial, and denies Salter's motion for reconsideration.

---

1  No motion for summary judgment has been filed by Taylor.

2  Motions for summary judgment (docs. 60 and 102) and memoranda, response, reply, and evidentiary materials in support and in opposition (docs. 61, 65, 70, 73, 74, 103, 104, 110, 111, 112, 114, 116, and 160).

3  Motions (docs. 115, 117, and 152); responses (docs. 125, 127, and 154).  The court anticipates addressing the defendants' five pending motions in limine (docs. 128, 129, 130, 178, and 179) at the pretrial conference.

## PROCEDURAL HISTORY

Salter initially filed suit in the Circuit Court of the First Judicial Circuit of Florida, following which the defendants removed this case to federal court.[4] (Doc. 1).  In his complaint Salter asserts four claims arising from events that occurred the evening of February 11, 2005, at the Las Javanas St. Valentine's Day dance, which was held at the Hadji Shrine Temple on W. Nine Mile Road in Escambia County, Florida.  Count I is brought pursuant to § 1983 and asserts that Taylor and Jarman used excessive force against Salter in the course of seizing and arresting him, in violation of the Fourth and Fourteenth Amendments of the U.S. Constitution.  Count II, which is also brought pursuant to § 1983, asserts that McNesby implemented an official policy, custom, and practice of failure to train and supervise that resulted in the unlawful use of excessive force by Jarman and Taylor.  Count III is a state law claim that asserts the conduct of Jarman and Taylor constitutes an intentional battery committed without malice for which, under the doctrine of respondeat superior, McNesby as their employer may be held liable; in the alternative, Count III asserts that the deputies' conduct was malicious and thus that they, rather than McNesby, are liable for the alleged battery. Count IV asserts that Taylor and Jarman were negligent in arresting him and that McNesby is liable for such negligence under the doctrine of respondeat superior.  As relief Salter seeks, inter alia, compensatory and punitive damages against Jarman and Taylor, and compensatory damages against McNesby.

## MOTION TO STRIKE

In their motion to strike, the defendants submit that certain of Salter's evidentiary materials are not properly authenticated and contain inadmissible hearsay. The defendants therefore request that Exhibits B through E, H, I, K, and S of Docket Entry # 111 [docs. 111-3, 4, 5, 6, 9, 10, 12 and 20], and references to those materials in Salter's statement of disputed facts, be stricken from the record and disregarded by the court.[5]

---

4  Taylor and Jarman filed a civil assault and battery counterclaim against Salter, which has been dismissed by stipulation of the parties. (Docs. 5, 40).

5   Exhibit B is an ECSO internal affairs report of an investigation conducted into allegations of the use of excessive force by former ECSO Deputy Charles Dix ("Dix") against Martha Bledsoe ("Bledsoe"); Exhibit C is Bledsoe's civil complaint brought in connection with her allegations against Dix and McNesby; Exhibit D is the settlement agreement reached in connection with Bledsoe's complaint; Exhibit E is a civil complaint and related settlement papers regarding claims brought by Chad Baxter against Dix, another deputy, and McNesby

Salter argues in response that the materials are not hearsay.  According to Salter, the materials have not been proffered to prove the truth of the matters asserted but instead are introduced only to prove that McNesby had notice of alleged wrongdoing by his deputies but failed to properly supervise them and thus was deliberately indifferent to their unlawful activities.  Additionally, Salter contends that to the extent certain of the documents may be hearsay, as public records they are subject to the public records exception to the hearsay rule.  Salter also submits that even if the documents are hearsay and are not subject to the public records exception, sufficient corroborating evidence exists to demonstrate their reliability such that they may be admitted over a hearsay objection.  Finally, according to Salter, even if any of the documents are inadmissible at this juncture, the court nonetheless should consider them at summary judgment because he will be able to properly admit the evidence through witness testimony at trial.

Salter does not address the defendants' contention that the challenged documents have not been properly authenticated.[6]  The court concludes that not only is evidence of the sort required by Rule 602 lacking with respect to the materials at issue but also that the materials do not comply with Fed.R.Evid. 901.[7]  Accordingly, the defendants' motion to strike shall be granted because the challenged materials lack proper authentication and thus a required predicate for admissibility is missing.  See Nolla Morell v. Riefkohl, 651 F.Supp. 134, 139 (D. Puerto Rico 1986) (refusing to consider documents that were not accompanied by affidavits or a certification attesting to their validity); Presley v. Carribean

---

that alleged the use of excessive force by the deputies; Exhibit H is an ECSO internal affairs report of an investigation conducted into allegations of the use of excessive force by former ECSO Deputy James Sullivan ("J. Sullivan") and another deputy; Exhibit I is a transcript of the recorded statement of a witness regarding an incident involving allegations of the use of excessive force by J. Sullivan; Exhibit K is a civil rights complaint brought by Michael Montgomery alleging the use of excessive force by J. Sullivan and two other deputies and related settlement papers; and Exhibit S consists of materials related to the arrest and prosecution of Jarman on charges of domestic violence.

6 In support of their argument defendants cite Fed.E.Evid. 602, which requires that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." The defendants' authentication objection presumably also relies on Fed.R.Evid. 901, which provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a).  Authenticity may be established by "[t]estimony of a witness with knowledge . . . that a matter is what it is claimed to be." Fed.R.Evid. 901(b)(1).

7 Furthermore, the substantive portions of the challenged materials do not fall within the scope of Rule 902, which provides for the admission of certain self-authenticating documents. Some of the documents contain items such as summonses, however, which arguably are self-authenticating.

Seal, 537 F.Supp. 956, 965 (S.D.Tex.1982) (refusing to consider exhibit attached to defendant's summary judgment because it lacked proper authentication, even though "there is probably no serious dispute as to the document's authenticity . . . ."). In ruling on the instant motions, the court therefore has not relied on Exhibits B through E, H, I, K, or S.[8]

Notwithstanding the foregoing finding, the court has reviewed the challenged documents, which pertain to Salter's failure to train and supervise claim against McNesby. The court notes that even if the materials had been properly authenticated and were otherwise admissible (as nonhearsay, for the limited purpose of showing that McNesby had notice of his deputies' alleged misconduct) and relevant (although the court observes that Exhibit S – despite Salter's allegation of an ECSO "cover-up" – has no relevance to these proceedings, a defect common to others of these exhibits), they would not change the court's ruling on the motions for summary judgment.

The materials, and those portions of Salter's statement of disputed fact that are based on them, proffer highly speculative and conclusory "proof"; they simply do not establish any specific facts showing that a genuine issue of material fact exists concerning Salter's claim that McNesby implemented an official policy, custom, or practice of failure to train and supervise that resulted in the unlawful use of excessive force by his deputies. In Thomas v. City of Chattanooga, 398 F.3d 426, 431 (6th Cir. 2005) , the Sixth Circuit held that evidence of forty-five suits of excessive force against the Chattanooga Police Department introduced to establish that the department had a custom of condoning excessive force by its officers was conclusory because the plaintiff had failed to produce any data regarding the "normal" number of excessive force complaints.  The same is true here:  Salter has not presented any comparative evidence showing that the four or five incidents of alleged use of excessive force he references exceed the "normal" number of

---

8  The court observes that other exhibits, submitted both by Salter and Jarman, suffer from the same authentication deficiency as the challenged exhibits.  No objections have been raised to these exhibits for purposes of summary judgment, however, so the court has considered them, as may be appropriate. To the extent the defendants object to certain materials in their pending motions in limine, as previously mentioned, the court shall consider such objections at the pretrial conference.

incidents expected for the ECSO.[9] Id.  Furthermore, in Gold v. City of Miami, 151 F.3d 1346 (11th Cir. 1998), the Eleventh Circuit reversed a jury award in favor of the plaintiff in a § 1983 action who alleged that the municipality had a policy of inadequate training and supervision of officers in connection with arrests made under the state's disorderly conduct statute, concluding that the plaintiff had failed to present sufficient evidence of prior constitutional violations or false arrests involving the statute. See Gold, 151 F.3d at 1351-53.  The court found plaintiff's evidence showing that 15% of disorderly conduct charges in five-year period were dismissed or nolle prossed, without also providing evidence of the specific reasons for the dispositions or evidence that those cases and plaintiff's case were factually similar, was insufficient to impose municipal liability. Id. at 351. Salter's challenged exhibits likewise lack factual or statistical context sufficient to give them evidentiary value.  For these reasons, Salter has not shown through the disputed exhibits that McNesby had notice of a problem requiring additional training or supervision. As a matter of law, therefore, based on Exhibits B through E, H, I, K, or S a reasonable jury could not find that McNesby was deliberately indifferent.

## MOTIONS FOR SUMMARY JUDGMENT

### Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  A factual dispute is "`genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit

---

9 Moreover, one of the internal investigations cited by Salter was not even completed until March 28, 2005, when the allegations of wrongdoing were sustained.  This timing does not support a finding that through the report McNesby had notice on February 11, 2005, of a problem requiring additional supervision or training. Also, the civil rights complaints associated with the Baxter and Montgomery incidents consist only of allegations.  That these cases eventually settled establishes only that the parties came to terms regarding those allegations; indeed, each of the releases specifically states that payment is not to be construed as an admission of liability.  Lacking relevance, neither the complaints nor the release documents would be admissible at trial. Moreover, although the Bledsoe allegations find substantiation in the internal affairs investigation report, because such evidence is conclusory for lack of comparative data, the report, the complaint, and the release papers would not be admissible at trial as evidence that McNesby had notice of a problem within the ECSO regarding the use of excessive force.

under the governing [substantive] law." <u>Anderson</u>, 477 U.S. at 248; <u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F.2d 994, 998 (11th Cir. 1992). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Nevertheless, a general denial unaccompanied by any evidentiary support will not suffice. <u>See</u>, <u>e.g.</u>, <u>Courson v. McMillian</u>, 939 F.2d 1479 (11th Cir. 1991); <u>Hutton v. Strickland</u>, 919 F.2d 1531 (11th Cir. 1991). Moreover, the existence of a scintilla of evidence in support of the nonmovant's position is insufficient; the test is "whether there is [evidence] upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 252.

**Factual Background**

As noted, at summary judgment this court must view the facts in the light most favorable to the nonmoving party. <u>See</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Accordingly, the following facts, which are drawn from the pleadings, depositions, and other evidentiary materials on file, are recited in the light most favorable to Salter or, except as noted, are undisputed. Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts or all of the facts. <u>See</u> <u>Montout v. Carr</u>, 114 F.3d 181, 182 (11th Cir. 1997); <u>see also</u> <u>Sharpley v. Raley</u>, 2005 WL 2840263, *2, n.2 (11th Cir. 2005) (stating that the "facts" as framed by the evidence at the summary judgment stage of a qualified immunity case may turn out not to be the true facts established at trial).

Salter attended the Las Javanas St. Valentine's Day dance held February 11, 2005, at the Hadji Shrine Temple. (Doc. 1 at 9, as enumerated by the court; doc. 61-2 at 5). Most of those attending the dance, including Salter, were students from various local high schools. (<u>Id.</u>). Defendant Jarman was off-duty from his job as a deputy sheriff but had been hired to work at the dance as a private security officer. (Doc. 61-4 at 8). Jarman initially was the only uniformed law enforcement officer in attendance at the dance; there were also approximately seven or eight adult chaperones, among them Robin Shuman

("Ms. Shuman") and Rebecca Rood ("Ms. Rood").[10]  (Doc. 61-5 at 5-6, 9-10; doc. 61-4 at 12).

At approximately 10:45 p.m. an altercation broke out on the dance floor among some of the male students.  (Doc. 61-2 at 15).  Salter was not involved in the initial altercation but heard a commotion, turned, and observed nearby one of his schoolmates bleeding from the nose.  Although he did not witness the incident himself, according to Salter a student from another school had punched his schoolmate in the nose.  (Doc. 61-2 at 16).  The youth who had struck Salter's schoolmate left the area and shortly thereafter an adult arrived who led the injured student to a bathroom to tend to his nosebleed. (Id. at 18).[11]

Jarman testified that at the time the fight erupted he was outside the building waiting for a student's parent to arrive and pick her up.[12]  (Doc. 61-4 at 10).  After being informed by a chaperone about the disturbance, Jarman immediately entered the hall. (Doc.  61-4 at 10).  Jarman did not see a fight but noticed a group of students who appeared to be engaged in some sort of argument or disagreement. (Id. at 13).  Jarman did not notice anyone with a bloody nose but as he got closer to the group he observed a male student with his arm "reared back" as if ready to strike someone in front of him. (Id.) at 14.  Jarman stepped in front of the student, announced "'Sheriff's Office," and ordered him to step back.[13]  (Id.).  The student failed to comply – in fact stepped forward – so Jarman placed

---

10   Apparently, at least one of the chaperones was an off-duty ECSO deputy.  (See doc. 111-17 at 7, ECSO offense report by Raymond Briggs).

11  (See also doc. 111-17 at 7, ECSO offense report by Raymond Briggs).

12   Some of the students arriving at the dance appeared to be under the influence of alcohol and were not permitted entrance to the building; these students' parents were contacted and directed to come and get their children. (Doc. 61-4 at 10; doc. 61-3 at 6). Ms. Rood testified that some of the arriving students were vomiting and "reeking of alcohol"; she also recalled that a group of students, whom she believed had been drinking, traveled to the function by bus together with some parents. (Doc. 61-3 at 6). According to Ms. Rood, "I didn't understand that.  So the parents knew they were there doing it." (Id.).
    Salter testified that he attended an unchaperoned party prior to the dance at which beer and whiskey were available.  Salter, who was seventeen years of age on the night of February 11, 2005, admitted consuming three glasses of cola and whiskey at the party.  Salter stated that he drank his last alcoholic beverage at approximately 8:15 p.m. and did not consume any additional alcohol while at the dance.  According to Salter, the alcohol "loosened" him up a bit but did not make him feel drunk.  Salter acknowledged that a blood test taken sometime after midnight revealed alcohol in his system.   (Doc. 61-2 at 5, 9, 55-60).

13  Salter maintains that Jarman approached the student from behind rather than from the front.  Salter does not, however, cite any evidence in support of this contention and his own testimony is that the first time he saw Jarman he was already wrestling on the floor with the student.  In any event, this fact is not material to

his hands on the student's chest and pushed him backwards.  (Id. at 14-15).  As Jarman did so, the student started swinging at him and struck him in the face.  The two then "tussle[d]" as Jarman attempted to subdue the youth.  (Id. at 16).

Ms. Shuman testified that when she first saw Jarman "he had his arms wrapped around the young man," holding him from the rear

> and the young man was resisting violently . . . doing everything with all his might to break loose of the grip.  Then this child kept fighting or pushing or trying to get – well, at one time he jerked away from him and then slugged the officer.  And I had a real clear  [view] of that punch.  Officer Jarman was trying to, you know, contain him or get – you know, subdue him or whatever, because he was fighting with all his might. . . .  While he was trying to restrain this one gentleman, another young man jumped on his back. . . . Rebecca Rood, who was also a chaperone, at this point she came up and she was close to me.  I watched her take the young man and just push him off of the officer.  Then while he was trying to contain this young man, I mean, they went on the floor, they knocked over chairs, and it was just quite a fight or quite a resistance, I guess would be an accurate term.

(Doc. 61-5 at 9-10).

During the incident Ms. Shuman could hear some of the young people shouting at the student with whom Jarman was wrestling, "'Hey, man, that's a cop.  Don't do that.'" She could also hear other students yelling at the officer, "'Let him go. He didn't do anything." (Id. at 13).  Jarman also recalled hearing some of the youngsters crying out, "You're arresting the wrong guy." (Doc. 61-4 at 15-16).

Ms. Rood testified that she was outside with Jarman when they were alerted to the disturbance inside and that she, Jarman, and another man quickly entered the building. Ms. Rood observed Jarman push one student away from another, trying to position them "so they couldn't get [at] each other" to fight.  (Doc. 61-3 at 9).   Ms. Rood also heard Jarman say to the crowd, "'I'm a police officer.  Y'all need to get back.' And he was telling all the kids to get back, and they still didn't do it."  (Doc. 61-3 at 11).

Ms. Rood also testified that after Jarman pushed the student backwards, the student

> hit Jeremy [Jarman] in the face with his fist.   And Jeremy was the only one there.  And then another kid ran and jumped on Jeremy's back.  And then he was trying to settle with the guy who hit him in the  face, got him, and walked out.  But, then again, there's kids still running and jumping on his back, trying to get him.  And then I got there and I was taking kids off of Jeremy too . . .

---

disposition of the pending motions.

because they were running and getting him.  So I was throwing kids off, too.

(Doc. 61-3 at 7-8).

According to Ms. Rood, she followed behind Jarman as he walked the handcuffed student outside; she could see that the student was acting "wild, trying to get away from him." (Doc. 61-3 at 13-14).  Ms. Rood heard Jarman tell the student to "'calm down.  I'm trying to get you outside,' [but] he was still going crazy." (Id. at 13).  Because Jarman's K-9 was in his patrol car Jarman could not place the handcuffed student in the vehicle.  (Doc. 61-4 at 18).  Jarman therefore "first had him on the car, like saying to stay, and then the kid wouldn't do it, so he put him on the ground, on his stomach, so he couldn't move." (Id. at 13).  Ms. Rood did not see Jarman strike the student or slam his head against the patrol car or "anything like that." (Id. at 14).

Ms. Rood also testified that while Jarman was struggling with the handcuffed student, other students who had followed them outside approached within two to three feet of Jarman, telling him "'You've got the wrong person' and getting in his face." (Id. at 14).  One student "was coming at him, like charging at him . . . so [Jarman] got him and put him on the ground, too." (Id. at 12).  Other officers arrived at about that time (id. at 12), which allowed Jarman to turn his attention to the "hysterical" handcuffed student on the ground, whom he was trying to calm (id. at 14).  When the student had been placed into a squad car Jarman asked Ms. Rood to help him locate his radio, which he had dropped inside.  Ms. Rood returned to the dance floor to look for the device; when she went back outside additional officers had arrived with their K-9s and seemed to be taking control of the scene.

Jarman testified that after he began "tussling" with the student on the dance floor, other students began jumping on his back.  (Doc. 61-4 at 17).  According to Jarman, he went down on his hands and knees on top of the student, "trying to hold my gun and protect my prisoner from crawling off or escaping or getting hurt." (Id.).  Once the chaperones had removed the students from his back, Jarman was able to stand and he exited the dance floor with the handcuffed student.[14]  (Id. at 18).  Before leaving the building Jarman called in a request for assistance and a car in which to place the student

_____

14   Jarman testified that during the scuffle he lost both his radio and his telephone and thus briefly had no communication to call for back-up; he apparently located one of the devices, however, before leaving the dance floor.  (Doc. 61-2 at 19).

Case No. 3:06cv110/MCR

since he had left his K-9 in his own cruiser. (Id. at 19). The chaperones closed the front doors to the hall and kept the majority of the students inside.

According to Jarman, he began escorting the handcuffed student outside to his vehicle, which was parked approximately twenty yards away from the building's front door, to wait for assistance. (Doc. 61-4 at19). A student, whom Jarman later identified as Salter, approached Jarman and repeatedly told him that he was arresting the wrong person. Jarman attempted to secure the handcuffed student by placing him face down over the hood of the patrol car. (Id. at 28). As he was doing so, Salter grabbed Jarman from behind, placing his arm around Jarman's neck. (Id. at 19). To secure the handcuffed student, who was "steadily pulling away" from him, and to defend himself from Salter Jarman went down on the ground with his prisoner. (Id. at 20). Jarman recalls that by doing this maneuver he either threw Salter off his back or Salter jumped off. (Id.). During this scuffle, Salter hit Jarman on the back of the head. (Id. at 23). Jarman knew it was Salter who hit him because he was "the only one standing there." (Id.).

Jarman further testified that after Salter jumped or was thrown from Jarman's back, he "came back" at Jarman and kept "leaning down in [Jarman's] face, closed fist. I told him to back off. If I told him once, I told him 20, 30 times to back off." (Doc. 61-4 at 24). Jarman recalls that he struck Salter in the face. (Id. at 27). "Now, whether – where I hit him, I don't know. I could not tell you.[15] At that point he was gone, when back-up was pulling up, he took off. He left. Because I started pointing, trying to look for him, to tell them to secure him because he's going to jail. He was gone." (Id. at 27). Although he was gesturing to the arriving deputies, Jarman did not specifically point Salter out to any of them. (Id. at 31).

Jarman saw defendant Taylor[16] and Deputy Sheriff Brunson ("Brunson"), the first of the back-up assistance he had requested, arrive at the hall at approximately the same time in separate cruisers, with Brunson pulling in slightly ahead of Taylor. (Doc. 61-4 at 26). Jarman moved the handcuffed student to Brunson's vehicle and "tried to forcefully put him

---

[15]   Jarman also testified unequivocally during his deposition that "I hit Addison Salter." (Doc. 61-4 at 33). Additionally, in his offense report Jarman states "I struck [Salter] in the face with my left hand." (Doc. 111-17 at 5).

[16]   Like Jarman, Taylor is a K-9 handler. On the evening of February 11, 2005, Taylor was working with his K-9, Awny.

over the hood.  It didn't work.  At that point Mr. Brunson got out and put him in the vehicle, if I remember correctly."  (Id. at 29).  With the student in the cruiser, Jarman went back inside the building because he had been informed that the disturbance had escalated and several students were fighting.  The chaperones had moved most of the students outside by that time, however, and there was no need for Jarman inside so he again left the hall. As he exited the front door Jarman saw Taylor "on his knees holding his canine with one hand and holding down the subject with his – with the other, who was in the prone position handcuffed."  (Id. at 30).  When Jarman helped the subject to his feet and took custody of him, he saw that the person was Salter.[17]  Jarman did not see Salter being apprehended by Taylor or his K-9; indeed, Jarman did not witness any of the events that transpired between Taylor and Salter.  (Id. at 32).

Taylor testified that he and Brunson were in their cruisers in the vicinity of the Shrine Temple, sitting "car to car" discussing another call to which Taylor had just responded, when they heard Jarman's request for assistance being broadcast on their radios.  (Doc. 104-8 at 4).  Both deputies immediately proceeded to the Shrine Temple.  (Id.).  As Taylor entered the grounds and approached the building he could see Jarman struggling with a suspect, falling to the ground, then beginning to rise.  (Id. at 5).  Taylor then saw Jarman approach Brunson's stopped cruiser with his prisoner, who was still struggling with Jarman, then place the prisoner over the hood of Brunson's vehicle.

At that moment Taylor's attention was drawn to two other white males, one of whom he later learned was Salter, who were "walking off"; the young men were yelling profanities at Jarman and shouting "'You've got the wrong person.  He didn't do anything.'" (Doc. 108-4 at 5).  Taylor described the two as "obviously upset" and "aggressive in their mannerisms."  Both young men started approaching Brunson's vehicle, so Brunson and Taylor yelled for them to back off; one of two stopped but the other, Salter, did not.  "So I told [Salter] to stop, back off, put my hand up to stop him."  Salter kept walking, in fact walked into Taylor, then slapped down Taylor's outstretched hand.  (Id. at 6).  "The whole time he was walking he was looking over me yelling at them . . . the same things . . . 'didn't

---

17  ECSO Deputy Jason Potts ("Potts") also responded to Jarman's call for assistance on February 11, 2005. He testified that he arrived on the scene in time to see Jarman escorting a handcuffed Salter.  (Doc. 111-18 at 16).  According to Potts, Salter was yelling and pulling against Jarman so strenuously that both of them fell to the ground.  Potts then aided Jarman by helping him to place Salter in another deputy's cruiser.  (Id.).

do anything.  He didn't read him his rights.'  He was yelling profanities, also."  (Id. at 7).
Taylor told Salter, "Don't hit me again.  He said, 'don't touch me.'  I said, 'you're under
arrest.  I went to grab him to handcuff him.   I had my flashlight in my hand.  I went to get
my handcuffs.  He slapped my hand down again.  And then started to kind of backpedal
. . . a backpedal sideways – not a run, but very quickly. . . .  I continually tried to grab him,
telling him 'stop,' you're under arrest, get on the ground."  (Id.).  Salter and Taylor moved
around in this manner in the area in front of the building for a distance of approximately
twenty to thirty yards, with Salter "slapping and pushing and punching, whatever he could
do to get me off of him."  (Id. at 8).  At some point Salter struck Taylor on the side of the
face, although Taylor is not certain that Salter hit him intentionally.  (Id.).

        Taylor testified that despite his efforts to do so, he simply "could not get [his] hands
on [Salter] to take him into custody" so Taylor decided to call Awny, his K-9, for assistance.
(Id. at 8).  Taylor activated the remote control device on his cruiser to open the door to
release Awny and called her, while also yelling at Salter to get down on the ground.  Salter
did not comply so, when Awny reached them seconds later, Taylor gave her the command
to seize.  The K-9 grabbed Salter in the left buttock.  (Id. at 9; doc. 111-17 at 7).  This
immobilized Salter and allowed Taylor to take him to the ground. (Id.). Taylor was holding
his flashlight during his encounter with Salter, dropping it during their scuffle on the ground,
but he never struck Salter with it. (Id. at 11). When Salter continued to resist Taylor, the K-
9 seized Salter again, this time on the right upper arm.[18]  Once Salter was secured in
handcuffs Taylor gave the K-9 the command to release and she obeyed. Salter was still
struggling to get up, so Taylor restrained the excited, barking Awny by the collar to keep
her from "think[ing] anything was going on," and he pressed Salter to the ground with one
knee.[19]  Within approximately thirty seconds, as Taylor remained kneeling over Salter,
Taylor saw Jarman exit the building.

        In some respects Salter's recollection of the relevant events at the dance is similar
to that of Ms. Shuman's, Ms. Rood's, Jarman's, and Taylor's but it differs significantly in

---

[18]  Taylor testified that Salter's persistent struggling caused Taylor to cut his own hands on the handcuffs.
(Doc. 104-8 at 9).

[19]  According to Taylor, from his initial contact with Salter until the time Salter was placed in handcuffs
approximately three minutes elapsed; Taylor also estimated that the K-9's contact with Salter lasted
approximately forty-five seconds.  (Doc. 104-8 at 10).

other, critical respects.  In testimony not significantly inconsistent with theirs, Salter recalls that immediately after the initial disturbance on the dance floor, while he was observing his friend with the bloody nose, he heard another noise and turned around in time to see Jarman on the floor on top of a male student whom Salter also knew.  Salter saw Jarman handcuff the student, who was lying on his abdomen, then get the student to his feet and start walking him outside.  (Doc. 61-2 at 22, 37).  As soon as Salter saw that the student was handcuffed he realized that Jarman was a law enforcement officer.  (Id. at 19).

Salter recalls that the area immediately in front of the outside of the hall was fairly well illuminated but the area to the east side of the building, where Jarman's cruiser was parked, was not.  (Doc. 61-2 at 24).  As Jarman walked the handcuffed student outside towards his cruiser, Salter followed along behind them at a distance of five to six feet. Salter repeatedly and forcefully told Jarman he had seized the wrong person and asked what his friend had done wrong; Jarman did not respond.  Another person also followed along behind Jarman but Salter cannot recall who this individual was.  (Id. at 22).  Salter observed nothing physical transpire between the handcuffed student and Jarman as they walked and he did not hear Jarman or the student say anything.  (Id. at 33).

When Jarman and the handcuffed student reached Jarman's cruiser, which Salter estimates was approximately ten to fifteen feet from the front door of the hall, Jarman slammed his prisoner's head against the hood of the car about five times.  (Doc. 61-2 at 23, 31, 34). Jarman did so for no reason as the student had neither done nor said anything to provoke him. (Id. at 34).  Salter was about six feet away at the time, screaming and cursing at Jarman, asking him "'What has he done wrong? What are you doing?  Why are you doing this?'" (Id. at 35, 36).  In response, Jarman "turned around and pushed me. . . . He came at me and pushed me.  And I put my hands up, and I said, 'What have I done?' When I put my hands up like this [demonstrating], my eye caught, from over here [indicating], Tim Taylor coming over and hitting me over the head with a flashlight."  (Id. at 37).  Salter testified that where he had been struck by the flashlight his head had later "lumped up" although he did not recall whether the skin had been broken.  (Id. at 39). According to Salter, at no time did he, or the other unidentified individual who was nearby, jump on Jarman's back, touch Jarman, or attempt to pull Jarman off the handcuffed student.  (Id. at 37, 38).

According to Salter, after Taylor struck him on the head with his flashlight Salter began backing up, with Taylor pursuing him and attempting to strike him with his fist. (Doc. 61-2 at 40). Taylor succeeded in striking Salter in the mouth at least once and perhaps several times[20]; Salter could not describe the blows as solid but stated that afterwards he had a "fat lip" from the encounter, with the inside of his mouth "kind of busted up a little bit." (Id. at 40, 41). In addition to striking him in the face, Salter thought Taylor might have struck him in the chest, although he was not certain. (Id.). Salter recalls "back-stepping" to evade Taylor, whom he did not identify as a law enforcement officer at the time, and trying to "figure out who this man was hitting me."[21] (Id. at 42). As Taylor pursued him Salter remembers yelling, "'Who are you?  What are you doing? What have I done?'" According to Salter, Taylor never ordered Salter to get on the ground.  Instead, Taylor grabbed Salter and threw him down, with Salter landing on his abdomen but not striking his face. (Id. at 44). Salter testified that as he lay on the ground thinking that he was "going to go to jail, you're being arrested . . . all of a sudden the dog comes and just starts ripping my arm off." (Id.). Salter recalls hearing the dog growling as she bit him but did not hear Taylor say anything to the K-9 or to him until he ordered Salter to place his hands behind his back. (Id. at 47-48). Salter replied by telling Taylor to "'[g]et your dog off my back and I can get my hands behind my back.'  And I tried pulling it . . . I had to pull the dog all the way back with my arm, and then he handcuffed me.  And then he pushed the dog off." (Id. at 48). After Taylor pushed the K-9 away from Salter, the dog bit Salter on the buttocks one time. (Id. at 49). Salter did not hear Taylor give the dog a command to release him but after she did so Salter was raised to his feet and placed in a cruiser. (Id. at 50). Salter was later taken to a hospital for treatment of his dog bite injuries but he did not recall receiving treatment for any mouth or head injuries.[22] (Id. at 39, 41; doc. 104-8

---

20  When asked how many times Taylor had struck him in the mouth, Salter replied, "I'm not sure.  I mean, I got punched – I know for a fact there was a least one punch to my mouth.  But I'm not real sure."  (Id. at 41).

21  Salter testified that it was not until he saw Taylor later than evening after his arrest that he identified him as law enforcement officer. (Doc. 61-2 at 42).

22  Salter has submitted no hospital records regarding his injuries or the treatment he received for any physical injuries he received on February 11, 2005.  He has, however, filed the affidavits and records of psychologists Darby L. Godwin, Ph.D., and Lawrence Gilgun, Ph.D.  Both psychologists state they have diagnosed Salter with post-traumatic stress disorder related to the events at issue in this case.  (Doc. 70).  The court notes that for privacy reasons these records should have been, but were not, filed under seal.  The clerk therefore shall be directed to seal Docket Entry # 70 as well as Docket Entries # 65, Exh. M, and # 69.

at 16).

Salter testified that he could not recall that Jarman had touched him in any way other than by shoving him on February 11, 2005. (Doc. 61-2 at 46). Moreover, during the altercation with Taylor Salter was unable to see Jarman; in fact, after Jarman pushed him Salter did not remember seeing Jarman again that night.[23] (Id.). Salter further testified that nothing he had done the evening of February 11, 2005, impaired his ability to remember the events that occurred. (Id. at 45). He acknowledged, however, that he had consumed alcohol at at the pre-dance party he attended but testified that he was not intoxicated.[24] (Id. at 58).

McNesby has submitted extensive evidence in support of his argument that he should be granted summary judgment on Salter's claim of failure to train or supervise. According to this evidence, as of February 2005 Jarman had been employed by the ECSO for approximately seven years and Taylor had been employed for sixteen years, with Taylor working as a K-9 handler throughout his service. (Doc.104-6 at 5; 104-5 at 6). Both Jarman and Taylor have received training at the law enforcement academy and by the ECSO. (Doc. 104-5 at 11; doc. 104-6 at 11). Additionally, Taylor has undergone extensive training in the mechanics of using a K-9 and also the appropriate circumstances for K-9 use; he also trains with his K-9 on a daily basis. (Doc. 104-5 at 5, 17; doc. 104-2 at 2).

In February 2005 the ECSO had a use of force policy that set out the circumstances in which deputies could employ physical force. Pursuant to that policy, which currently remains in effect, the use of force is permitted to preserve the safety of officers, other persons, or the public in general. (Doc. 104-3 at 4-5). A deputy's use of force is subject to review by persons in the deputy's supervisory chain of command, up to and including

---

23  Jarman testified, however, that it was he who helped Salter to his feet after being handcuffed by Taylor. According to Jarman, he stated to Salter, "'You brought it all on yourself. I told you to back off.'" (Doc. 61-4 at 31).

24  The arrest report suggests that Salter and two other youths arrested on February 11, 2005, were charged with battery on a law enforcement officer (Fla. Stat. § 784.07(2)(b)), resisting an officer with violence (Fla. Stat. § 843.01), and breach of the peace or disorderly conduct (Fla. Stat. § 877.03). (Doc. 111-17 at 4). The former two offenses are identified as felonies on the offense report while the latter is described as a second degree misdemeanor. (Id.).
    Jarman has submitted an unauthenticated copy of a signed plea agreement dated May 17, 2005. The plea agreement indicates that in the Juvenile Division of the Circuit Court for Escambia County, Salter agreed to enter a plea of nolo contendere to charges of simple battery and resisting arrest without violence. The state recommended that adjudication of delinquency be withheld and indicated that the charges would be dismissed upon successful completion of the terms of probation. (Doc. 74-2).

Case No. 3:06cv110/MCR

McNesby.  Under the policy, supervisors review the deputy's use of force report or other report and investigate any complaints made by persons regarding the incident at issue. If a supervisor's review of the reports or complaint(s) reveals a use of force or other action that appears to have been inappropriate or excessive under the circumstances, the matter is addressed with the deputy involved and may result in an internal affairs investigation. In other instances, the use of force incident may be addressed without the need for further investigation if the incident is obviously inappropriate.  (Id.).  In past cases in which an internal affairs investigation determined that the use of force or other action was inappropriate, the deputy involved was disciplined, his employment terminated, or he was demoted or allowed to resign.  In addition to the imposition of discipline, deputies who are found to have engaged in the inappropriate use of force may be referred to or may request counseling.   (Id. at 5).

The ECSO has also adopted specific policies and procedures with regard to the use of K-9s. (Doc. 104-2 at 2-3).  Pursuant to ECSO practice, which was in effect in February 2005 and is currently in effect, the K-9 supervisor and the deputy's supervisor review the use report that the K-9 handler must complete each time he deploys his K-9. (Id. at 3-5). Under this policy, the handler must also complete a suspect resistance report which the K-9 supervisor reviews in order to determine whether the K-9 use was appropriate or excessive. In evaluating these reports, the K-9 supervisor examines such information as the location of the use, the size of the person apprehended, the number of officers present at the scene, and the nature of the offense committed by the person apprehended.  The K-9 reports are also reviewed to evaluate whether a particular deputy is engaging in excessive K-9 use or if the K-9 appears to have been engaging in an excessive number of bites.   If a specific occurrence or an overall pattern of K-9 use appears to be inappropriate, the K-9 supervisor or the deputy's immediate supervisor addresses such use with the deputy and discusses ways to avoid similar situations in the future.

Following the February 11, 2005, incident that is at issue in this case, the ECSO performed both a criminal investigation into Jarman's conduct and an investigation based on a citizen's complaint.  (Doc. 104-3 at 3-4).  No discipline was imposed on Jarman as a result of the investigations because, according to the reviewing supervisors, it could not be concluded that he had violated the policies or procedures of the ECSO.  (Id.).  Taylor's K-9

supervisor also reviewed his K-9 use report and determined that Taylor's deployment of the K-9 was appropriate under the circumstances and within the scope of the ECSO general orders as well as commonly accepted K-9 use.  (Doc. 104-2 at 3-4; <u>see</u> <u>also</u> doc. 104-11).  According to McNesby, neither Jarman nor Taylor has been the subject of a complaint regarding the use of force or other internal affairs investigation that has resulted in a finding of misconduct:  any complaints that have been brought against them have been investigated internally and determined to be unfounded or have not been sustained based on the evidence presented. (Doc. 104-3 at 4).  There also have been no complaints or cases against the ECSO that have resulted in a determination that the use of a K-9 constituted excessive force. (<u>Id.</u>).

Salter has also submitted extensive materials pertaining to his failure to train or supervise claim against McNesby.[25]  According to this evidence, McNesby does not dispute that Taylor was acting in accordance with official ECSO policy when he ordered his K-9 to seize Salter the evening of February 11, 2005.  (Doc. 111-2).  Additionally, with respect to Salter's contention that McNesby has failed to supervise deputies' handling of videotapes taken by cruiser-mounted cameras, McNesby acknowledges being aware that many of the tapes are never accounted for or turned in by deputies, as required by ECSO policy. (Docs. 111-13 at 7, 11-14; 111-14; 111-15).  In particular, Salter points to evidence that  five of the ten deputies who responded to the Shrine Temple on February 11, 2005, had in-cruiser video capability but only one deputy apparently submitted his videotape as the policy requires. (Doc. 111-17).  Moreover, the single videotape produced by McNesby only reflects an unrelated vehicle stop; the tape contains no images from the incident at issue in this case, even though the officer who recorded it and Potts both indicated that such

---

[25]  In outlining the parties' factual contentions the court has not discussed the stricken exhibits.  Nor has the court discussed an additional exhibit referenced by Salter in his statement of disputed facts, the affidavit of Gloria Uzzell, to which the defendants have made no objection for summary judgment purposes. (Doc. 114).  In her affidavit Ms. Uzzell cites certain contacts she had with Jarman in March and April of 2006. (<u>Id.</u> at 3).  According to Ms. Uzzell, among other acts of "unsavory behavior" by Jarman, he stated to another person that he would help cut off her head and throw it in Choctawhatchee Bay.  Ms. Uzzell states that she reported Jarman's conduct and statement to the ECSO, was interviewed by a deputy about her complaint, but was never informed by the ECSO that any investigation had been performed.

The assertions made by Ms. Uzzell in her affidavit are not relevant to the matters at issue in the instant case.  The alleged events occurred more than one year after the Las Javanas dance incident and, furthermore, are not in any way related to Salter's claims.  Notwithstanding Salter's contention otherwise, because the statements in the affidavit lack relevance to this case the court need not discuss and does not consider the affidavit further.

footage existed.[26] (Doc. 112; doc. 111-17 at 11; doc. 111-18 at 22).

Regarding McNesby's alleged failure to train and supervise, Salter also points to McNesby's testimony regarding Taylor's use of force on February 11, 2005. McNesby stated that striking a suspect with a flashlight could constitute the use of deadly force (doc. 111-13 at 15) and that, "from what little I know about" the incident, it would have been appropriate for Taylor to use deadly force against Salter, given exigent circumstances that could have given rise to Taylor's fear of imminent bodily harm or injury. (Doc. 111-13 at 4, 5). Salter also relies on expert testimony from John Lee Sullivan that the force used by the deputies was excessive and that McNesby conducted a superficial investigation of the incident which demonstrates his deliberate indifference to the violation of Salter's constitutional rights. (Doc. 111-22 at 130-136).

## Defendant Jarman

## Count I: § 1983 – Use of Excessive Force

### The Parties' Contentions

In Count I of his complaint Salter alleges the use of excessive force by Jarman and Jarman's failure to intervene in the use of excessive force by Taylor. Jarman argues that he is entitled to summary judgment because Salter's own deposition testimony does not support a finding that Jarman violated the constitution. According to Jarman, Salter does not assert that Jarman did anything more than shove him, that the shove caused him any injury, or that Jarman was even present when Taylor allegedly struck Salter or when Taylor commanded Awny to seize him. Jarman also argues that he is entitled to qualified immunity because, even if a constitutional violation occurred, there is no evidence that Jarman took any actions that a reasonable law enforcement officer would have known violated clearly established law.

Salter responds that Jarman admits having struck him in the face and that at some point while Taylor, Jarman, and Salter were outside the hall Salter received a "fat lip." According to Salter, when the evidence is taken in the light most favorable to him, including

---

26  Potts testified that he had viewed the videotape, which he described as being approximately thirty to forty minutes in length and having no evidentiary value. (Doc. 111-18 at 22). According to Potts, the deputy from whose vehicle the videotape was made arrived after the "main incidents took place, where subjects were arrested. And his video camera . . . filmed us getting – all the officers getting the juveniles to exit [the building] in an orderly fashion. I viewed the tape, and there's no evidence on it – or of value, other than the juveniles exiting the building." (Id. at 22-23).

Salter filed the single videotape produced by McNesby during discovery which purportedly recorded the students leaving the hall. (Doc. 112). The court's review of this videotape, however, supports Salter's description that it contains no footage pertaining to the Las Javanas dance.

that no probable cause existed to arrest him, it must be concluded that genuine issues of material fact exist regarding whether Jarman punched him and whether this act constituted excessive force.  (Doc. 65 at 3, 9).  Salter also disputes Jarman's entitlement to qualified immunity.

In reply, Jarman contends that Salter admitted in his testimony that Jarman did nothing more than shove him; Salter has also testified that it was Taylor who hit him with the flashlight and also struck him in the face.[27]  Jarman further submits that although in the offense report he stated that he had struck Salter in the face, taking the report in conjunction with Salter's testimony, it is apparent that in fact he merely attempted to strike Salter and failed, though he mistakenly believed he had succeeded.  Jarman also complains that Salter cannot rely on this statement in the offense report without also accepting other aspects of Jarman's account of the events, including that Salter interfered with his arrest of the handcuffed student and battered Jarman.  According to Jarman, taking Jarman's report in its entirety as well as Salter's admissions made pursuant to his nolo contendere plea to the battery charge, "even if Jarman did strike Plaintiff as part of [the] altercation, such a striking would have been justified based upon Plaintiff's actions and therefore would not constitute excessive force . . . ."  Jarman also argues that Salter's nolo contendere plea "necessarily constitutes an admission of the facts upon which that arrest was based." (Doc. 73 at 9). According to Jarman, Salter's actions, as described in the report, render Jarman's use of force reasonable and permissible "and, at a very minimum, entitle[ ] him to qualified immunity."  (Id. at 7).  Finally, Jarman states that the medical records submitted by Salter in support of his claim of suffering post traumatic stress disorder reveal that the symptoms from which Salter suffers are all related to actions allegedly taken by Taylor, including striking Salter with a flashlight, punching him, and commanding the K-9 to seize him; Jarman's shove is not implicated in these injuries.

Legal Standards: Use of Excessive Force and Qualified Immunity

"To assert a Fourth Amendment claim based on the use of excessive force, the plaintiff[ ] must allege (1) that a seizure occurred and (2) that the force used to effect the seizure was unreasonable." Troupe v. Sarasota County,  419 F.3d 1160, 1166 (11th Cir. 2005).  "A seizure occurs when an officer restrains the freedom of a person to walk away."

---

27  Any argument otherwise, Jarman submits, is an attempt by counsel to misstate the evidence and avoid the consequences of Salter's own admissions.

Evans v. Hightower, 117 F.3d 1318, 1320 (11th Cir. 1997) (citing Tennessee v. Garner, 471 U.S. 1, 7 (1985)).

The Supreme Court has instructed that all claims of the use of excessive force by law enforcement officers in the course of an arrest or other seizure are properly analyzed under the Fourth Amendment and its reasonableness standard.  See Jackson v. Sauls, 206 F.3d 1156, 1167 (11th Cir. 2000) (quoting Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)).  The court's inquiry in an excessive force case must focus on whether the officer's actions were "objectively reasonable" in light of the facts and circumstances confronting him; thus his conduct must be judged from "the perspective of a reasonable officer on the scene, rather than through the lens of hindsight [ ], taking into account all of the attendant circumstances." Kesinger v. Harrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (citing Graham); Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002).  In examining the officer's conduct, the court should look to the "totality of circumstances" to determine if the manner of arrest was reasonable. See Draper v. Reynolds, 369 F.3d 1270, 1277 (11th Cir. 2004) (citation omitted).  To assess whether the force used was reasonable, "courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Id. at 1277-78 (citations and footnote modified)); see also Vinyard, 311 F.3d at 1347.  The need for the application of force is assessed by whether the force used was reasonably proportionate to the need for that force, which is measured by considering the severity of the crime, whether the suspect posed an immediate danger to the officer or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  See Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003) (quoting Graham, as cited in Lee v. Ferraro, 284 F.3d 1188, 1197-98 (11th Cir. 2002)); see also Draper, 369 F.3d at 1277, n.13 (citing Lee).  "[A] minimal amount of force and injury . . . will not defeat an officer's qualified immunity in an excessive force case." Nolin v. Isbell, 207 F.3d 1253, 1258 (11th Cir. 2000) (footnote omitted).  Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at  396-97; see also Crosby v. Monroe County, 394 F.3d 1328, 1333 (11th Cir. 2004) (noting that courts must not "view the matter as judges from the comfort and safety

of our chambers . . . [but rather]  must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction . . . ").

_____A government official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity.  See Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1263 (11th Cir. 2004). It is well settled that "[q]ualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard, 311 F.3d at 1346 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  As a general proposition, "[i]t is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment." Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir.1998).  Thus, with regard to a claim of the use of excessive force, if an objectively reasonable officer in the same situation could have believed that the force used was not excessive, the defendant is entitled to qualified immunity. Anderson v. Creighton, 483 U.S. 635, 638-41, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Kesinger, 381 F.3d at 1247.

To be eligible for qualified immunity, the official must first establish that he was performing a "discretionary function" at the time the alleged violation of federal law occurred. See Crosby, 394 F.3d at 1331(citing Holloman, 370 F.3d at 1263-64).  Once the official has established that he was engaged in a discretionary function, the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity. See Holloman, 370 F.3d at 1264.  The Supreme Court has set forth a two-part test for the qualified immunity analysis. "The threshold inquiry a court must undertake . . . is whether [the] plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.  "If a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" Vinyard, 311 F.3d at 1346 (quoting Saucier, 533 U.S. at 201). Before qualified immunity is surrendered by an officer, he is entitled to

fair and clear warning that the challenged conduct violates federally protected rights. See Vinyard, 311 F.3d at 1350-51. "A principle of constitutional law can be 'clearly established' even if there are 'notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." Holloman, 370 F.3d at 1277 (quoting United States v. Lanier, 520 U.S. 259, 269, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997)).

          Legal Analysis

As a threshold matter, the court finds that Jarman was engaged in a discretionary function during the events at issue in this case which, it is undisputed, fall within the official duties of a sheriff's deputy. See Crosby, 394 F.3d at 1332. The court must next consider whether Salter has shown that his allegations, if true, establish a constitutional violation. See Hope, 536 U.S. at 122.

The court first finds that a genuine issue of material fact exists as to whether Jarman struck Salter in the face. Salter testified that Jarman did nothing more than shove him but Jarman explicitly stated in his offense report, which was drafted shortly after the incident, that he hit Salter. Jarman also specifically so testified in his deposition. Whether Jarman in fact struck Salter in the face, whether Jarman merely shoved Salter, or whether some other series of events in fact occurred therefore is a matter for a jury to decide.[28]

Assuming for purposes of this discussion that Jarman in fact did strike Salter in the face, the court proceeds to consideration of the Graham factors to assess whether the force allegedly used by Jarman was reasonable. Salter's testimony that he did nothing more than yell questions and profanities at Jarman stands in sharp contrast to Jarman's version of events, which has Salter grabbing Jarman from behind, placing his closed fist near Jarman's face, and striking Jarman in the head. Viewing the evidence in the light most favorable to Salter, however, as it must for purposes of summary judgment, the court accepts Salter's testimony that he was yelling at Jarman but did not touch or otherwise physically interfere with him. Thus viewed, the evidence suggests that Jarman could not

---

28   The court notes the presumably rare and somewhat odd circumstance presented here, e.g., that a factfinder must be called upon to decide whether or not a defendant committed an act that he admittedly committed (and for which, depending on the circumstances, he could potentially be held civilly liable) but that the plaintiff has indicated he did not commit. Given that credibility must be assessed to make such a determination, however, the issue indeed must be seen as presenting a jury question.

have suspected Salter of having committed a serious offense.[29]  Furthermore, the court concludes that although Salter admittedly was verbally accosting Jarman he did not pose a serious risk of immediate danger to him.  Additionally, accepting the evidence in the light most favorable to Salter (including Ms. Rood's testimony that a youth – whom she never identified  – closely followed and then "charged" at Jarman as he was struggling with his prisoner), the court is persuaded that the evidence does not support a finding as a matter of law that Salter actively resisted or threatened Jarman. For these reasons, the "need for the application of force" consideration may be deemed to be in Salter's "column."

---

29  Salter does not assert a separate false arrest claim in his complaint.  In discussing the Graham factors in his response to the motion for summary judgment, however, Salter raises the issue of the lawfulness of his arrest.  Salter argues that "[b]ecause in the light most favorable to Plaintiff, Plaintiff did not physically impede or prevent Defendant Jarman from his lawful duty . . . Defendant Jarman did not even have arguable probable cause to arrest the Plaintiff.  Because Defendant Jarman did not have probable cause to arrest the Plaintiff, his act of turning and punching the Plaintiff was clearly an excessive use of force under the circumstances." (Doc. 65 at 9). Jarman argues in response that Salter's nolo contendere plea "necessarily constitutes an admission of the facts upon which that arrest was based.  Thus,  Plaintiff's . . . asserting that no probable cause existed for Plaintiff's arrest and to thereby argue any use of force by Jarman was excessive, ignores the fact of Plaintiff's own plea, admission and conviction."  (Doc. 73 at 9).
    The court first notes that some older Eleventh Circuit precedent suggests the existence of a bright-line rule that the use of any force without probable cause for arrest would support an excessive force claim. See Sheth v. Webster, 145 F.3d 1231, 1238 (11th Cir. 1998) (stating that where there is an "absence of any justification for [an officer's] use of force, application of the Fourth Amendment reasonableness standard 'would inevitably lead every reasonable officer . . . to conclude that the force was unlawful'") (citing Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993)); see also Thornton, 132 F.3d at 1400 (stating that "[u]nder the circumstances, the officers were not justified in using any force, and a reasonable officer thus would have recognized that the force used was excessive."). Recently, however, the Eleventh Circuit has clarified the law on the use of force without probable cause for arrest, explaining that "[w]hen properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest." Bashir v. Rockdale County, Georgia, 445 F.3d 1323, 1332 (11th Cir. 2006); Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1304 (11th Cir. 2006) (citing Bashir).
     As mentioned, Salter does not assert a false arrest claim and, notwithstanding his current argument regarding the lawfulness of his arrest, his claim of excessive force is not "predicated solely on allegations the arresting officer lacked the power to make an arrest . . ." and thus that any force used was excessive. Bashir, 445 F.3d at 1332. Rather, Salter's contention that Jarman may have struck him in the face when Salter did nothing more than verbally protest another person's arrest presents a discrete excessive force claim. Accordingly, as a determination of whether Salter's arrest was lawful is not necessary to the disposition of his claim of the use of excessive force, the court need not discuss the parties' arguments further.
    The court observes, however, that Jarman's reliance on Salter's plea agreement is misplaced.  Although Salter apparently does not dispute the authenticity of the plea agreement or that the plea in fact was entered, Jarman has not supplied any documents showing that the state court in fact accepted the plea.  Additionally, although the plea agreement states that the factual basis for the plea is the arrest report that is part of the state court record, that record has not been filed in connection with the instant case.  The arrest report referenced in the plea agreement may well be identical to the offense report that has been filed in this matter but Jarman does not allege and has not shown that to be the case.  Most importantly, even if the offense report in evidence in this matter were relied upon as the document referenced in the plea agreement, the conduct attributed to Salter in the offense report cannot be linked with any certainty to the specific charges for which he agreed to plead nolo contendere, much less connected specifically to Salter's interactions with Jarman rather than Taylor.  Moreover, Salter disputes much of the offense report's contents.  In short, even if the plea agreement were relied upon, it cannot be determined from that document precisely what conduct Salter should be held to have admitted that relates to Jarman.  In addition, the plea agreement indicates that the State intended to dismiss the charges against Salter when he successfully completed his probation. If the charges in fact have been dismissed, this court has not been so informed.

Next, the court considers the relationship between the need for force and the actual amount of force used.  Again viewing the evidence in the light most favorable to Salter and assuming that the actual amount of force used by Jarman included a blow to Salter's face, the court concludes that such amount of force was disproportionate to the need, based on the existing circumstances as described by Salter.  Thus this factor also weighs in Salter's favor.

Finally, the court concludes that Graham's "extent of injury" factor weighs slightly in Salter's favor.  The court notes that the only physical injury even allegedly related to Jarman is Salter's reported "fat lip." A "fat lip" does not constitute a more than de minimis injury. See Nolin, 207 F.3d at 1258 n. 4 (stating that bruises received during an arrest were non-actionable de minimis injury); Lee v. Wilson, 2007 WL 2141956 (5th Cir. 2007) (finding prisoner's "busted lip" was de minimis injury). Salter also, however, asserts that he sustained emotional injuries as a result of the events of February 11, 2005.  These purported injuries appear to be primarily related to Salter's allegations involving Taylor but they arguably also pertain to Jarman's alleged conduct.  Accordingly, this factor also falls slightly in Salter's column.

Based on the foregoing analysis regarding the reasonableness of the alleged force used, the court concludes that Salter has met his burden of demonstrating that his allegations of the use of excessive force, when taken as true, establish a constitutional violation.[30] Hope, 536 U.S. at 738.

The court also concludes that Jarman is not presently entitled to a grant of qualified immunity with respect to Salter's allegations.[31]  Even absent a case presenting precisely the same set of facts as those presented here, a reasonable officer faced with the circumstances described in Salter's allegations, read in the light most favorable to Salter,

---

[30]  The court again notes that the facts are highly disputed.  If, as opposed to Salter's version of the facts, the court instead viewed the facts in the light most favorable to Jarman, the stated facts upon which the court made its reasonableness determination would be quite different. For purposes of summary judgment, however, the court is bound to the facts as stated.  When the actual facts are determined by the jury at trial, however, the court may revisit its reasonableness analysis pursuant to a motion for judgment as a matter of law, if Jarman so moves.

[31]  The Eleventh Circuit has observed that "a defendant who does not win summary judgment on qualified immunity grounds may yet prevail on those grounds at or after trial on a motion for a judgment as a matter of law." Cottrell v. Caldwell, 85 F.3d 1480, 1487-88 (11th Cir. 1996) (citing Adams v. St. Lucie County Sheriff's Department, 962 F.2d 1563, 1578-79 (11th Cir. 1992) (Edmondson, J., dissenting), approved en banc, 998 F.2d 923 (11th Cir. 1993)). Moreover, a district court can, "when needed . . . use special verdicts or written interrogatories to the jury to resolve disputed facts before the judge rules on the qualified-immunity question." Id.

would have had "fair notice" that punching Salter in the face based on no more than a vociferous protest of another individual's arrest "was unlawful, and that any mistake to the contrary would have been unreasonable."[32] Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1060 (9th Cir. 2003); Vinyard, 311 F.3d at 1350 (noting that conspicuously bad conduct does not require case law to establish its unlawfulness). With respect to the question of whether Jarman used excessive force against Salter, Jarman's motion for summary judgment is therefore denied and this claim shall proceed to trial.

With respect to the question of whether Jarman failed to intervene in the use of excessive force by Taylor, the motion is granted.  The Eleventh Circuit has held that a law enforcement officer can be liable for failing to intervene when another officer uses excessive force, but only if the officer is in a position to intervene but fails to do so. See Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th Cir. 1998) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable").  The evidence in the instant case is undisputed that Jarman was not in the immediate vicinity when Taylor commanded Awny to seize Salter and that Jarman did not even witness this event.  As the facts viewed in the light most favorable to Salter reveal that Jarman had no opportunity to intervene in any alleged use of excessive force by Taylor, Jarman cannot be held liable for failing to act. See Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000).

**Count III: State Law – Battery**

In Count III Salter alleges that Jarman's use of force was malicious and thus constitutes battery under state law.  Jarman asserts that the force was appropriate and not excessive under the circumstances and therefore Salter has failed to prove the elements of his state law battery claim.  Salter submits that because the evidence, construed in his favor, indicates that he did not threaten or touch Jarman but rather merely verbally communicated with him, there is a genuine issue of material fact regarding whether Jarman committed a battery by maliciously punching him in the face.

Ordinarily, "a presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only where the force used is

---

32   Again, according to the evidence viewed in the light most favorable to Salter, at the time Jarman may have struck Salter, Salter was a non-arrestee who was yelling questions at Jarman and cursing at him but not physically interfering with Jarman.

clearly excessive." <u>City of Miami v. Sanders</u>, 672 So.2d 46, 47 (Fla. 3d DCA 1996); <u>see also Scarbrough v. Myles</u>, 245 F.3d 1299, 1303 n. 9 (11th Cir. 2001) (recognizing that discretionary function immunity provides less protection to a defendant on state law claims against him than does qualified immunity on federal claims). If an officer uses excessive force, the "ordinarily protected use of force . . . is transformed into a battery."[33] <u>City of Miami</u>, 672 So.2d at 47; <u>see also Davis v. Williams</u>, 451 F.3d 759, 768 (11th Cir. 2006). Additionally, Florida law provides sovereign immunity to law enforcement personnel in carrying out their duties, unless their actions were committed "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a).[34] The Florida Supreme Court has instructed that "[t]he veil [of sovereign immunity] is lifted only where the employee's act fell outside the scope of employment, in which event sovereign immunity then shields the employing agency from liability." <u>McGhee v. Volusia County</u>, 679 So.2d 729, 733 (Fla.1996). The court further explained that "[i]n any given situation, either the agency can be held liable under Florida law, or the employee, but not both." <u>Id.</u>

As discussed previously in the court's analysis of Salter's § 1983 claim, the facts viewed in the light most favorable to Salter reveal disputed issues of material fact as to whether Jarman struck Salter in the face and whether such use of force was reasonable. In Florida, whether a law enforcement officer's "use of force was reasonably necessary is an issue of fact for the jury to determine." <u>Ansley v. Heinrich</u>, 925 F.2d 1339, 1343 (11th Cir. 1991); <u>Johnson v. Department of Health and Rehabilitative Services</u>, 695 So.2d. 927 (Fla. 2d DCA 1997). Accordingly, based on the facts and reasoning set forth above, the court concludes that Jarman's motion for summary judgment should also be denied as to Count III and that this claim, insofar as it pertains to Jarman, should also proceed to trial.

---

33 In Florida, the tort of battery "consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent." <u>Quilling v. Price</u>, 894 So.2d 1061, 1063 (Fla. 5th DCA 2005). Where excessive force is found to have been used during an arrest, a law enforcement officer's ordinarily protected use of force is transformed into a battery. See <u>Mazzilli v. Doud</u>, 485 So.2d 477, 481 (Fla. 3d DCA) (Schwartz, C.J., concurring in part).

34 This statute provides:
    The state or its subdivisions shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.
Fla. Stat. § 768.28(9)(a).

**Defendant McNesby**[35]

**Count II: § 1983  – Custom, Practice, or Policy of Failure to Train and Supervise**

<u>The Parties' Contentions</u>

Count II is Salter's failure to train and supervise claim against McNesby in his official capacity.[36]  McNesby moves for summary judgment on this claim, arguing that the evidence fails to show a custom, practice, or policy that authorizes the use of excessive force or improper K-9 use.   McNesby also submits that no causal connection has been shown between Salter's alleged injury and McNesby's alleged conduct and that <u>respondeat superior</u> appears to be the primary basis for Salter's claims against McNesby but this doctrine cannot provide the basis for official capacity liability in a § 1983 lawsuit.  (Doc. 102 at 2-3).   In response Salter contends that McNesby has effectively ratified Taylor's use of excessive force; according to Salter, because McNesby has admitted that Taylor acted in accordance with ECSO policy when he ordered Awny to seize Salter, Taylor's actions must be characterized as official acts of McNesby for purposes of § 1983 liability. Additionally, Salter maintains that he has submitted evidence of complaints of excessive force in which the ECSO conducted no or insufficient investigations and took no meaningful remedial action.  Salter argues that such evidence creates a genuine issue of material fact as to whether McNesby had a custom, policy, or practice of failing to adequately supervise his deputies and thus that summary judgment should be denied.

<u>Legal Standard: Municipal Liability</u>

There is no <u>respondeat superior</u> liability holding a municipality liable for the wrongful actions of its law enforcement officers; the municipality may only be held liable when municipal official policy causes a constitutional violation.  <u>See</u> <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 692, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); <u>see</u> <u>also</u> <u>Gold</u>, 151 F.3d at 1350. To impose § 1983 liability on a municipality, a plaintiff must show: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or

---

35  Salter states, incorrectly, that McNesby's motion was untimely filed.  Pursuant to the court's order entered July 27, 2006, the motion was timely.  (<u>See</u> doc. 21).

36  A Florida sheriff is a county official who, in his official capacity, may be subject to § 1983 liability with respect to claims that a custom, practice, or policy of the municipality violate the constitution.  <u>See</u> <u>Hutton v. Strickland</u>, 919 F.2d 1531,1542 (11th Cir. 1990).  When, as here, the defendant is the county sheriff, the suit is effectively an action against the governmental entity he represents, which in this case is Escambia County.  <u>McMillian v. Monroe County</u>, 520 U.S. 781, 785 n. 2, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997).

policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

In Griffin v. City of Opa-Locka, 261 F.3d 1295, 1308 (11th Cir. 2001), the Eleventh Circuit explained that

> To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law. In addition, we have also held that a municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy if the municipality tacitly authorizes these actions or displays deliberate indifference towards the misconduct.

Griffin v. City of Opa-Locka, 261 F.3d 1295, 1308 (11th Cir. 2001) (citation and internal quotation marks omitted). A custom is "'a practice that is so settled and permanent that it takes on the force of law.'" McDowell, 392 F.3d at 1290 (internal citations omitted). To demonstrate a policy or custom a plaintiff generally is required to show a "persistent and widespread practice."  Church v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir. 1994). To establish deliberate indifference, "a plaintiff must present some evidence that the [government entity or policymaker] knew of a need to train and/or supervise in a particular area and the [government entity or policymaker] made a deliberate choice not to take any action." Gold, 151 F.3d at 1350.  To establish his claim of the failure to train or supervise, a plaintiff is held to a high standard in showing the connection between the training or supervision and the injury suffered.  A plaintiff is required to "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).  Moreover, "the identified deficiency in a city's training program must be closely related to the ultimate injury . . . [the plaintiff] must still prove that the deficiency in training actually caused [the plaintiff's injury]." City of Canton, 489 U.S. at  391. This high standard is necessary because "a lesser standard of fault would result in de facto respondeat superior liability on municipalities – a result [the Supreme Court] rejected in Monell." Id. at 392.  Indeed, the mere fact that a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee permits no inference of municipal culpability and causation. See McDowell, 392 F.3d at 1289 (citation

omitted).

Legal Analysis

For the purpose of identifying the specific constitutional right allegedly infringed, as required under the first prong of the municipal liability analysis, the court assumes a violation of Salter's constitutional right to be free from the use of excessive force. That a right was violated, however, "does not necessarily mean that [McNesby] is liable for [the violation alleged.]" Vineyard v. County of Murray, 990 F.2d 1207, 1211 (11th Cir. 1993).

Next, the court must consider whether the ECSO had a custom, policy, or practice that constituted deliberate indifference to Salter's right to be free of the use of excessive force.  In his responsive memoranda Salter does not specifically identify the evidence which he contends shows that the ECSO received complaints of excessive force but failed to conduct investigations and took no meaningful remedial action.  Presumably, this evidence includes stricken Exhibits B through E, H, I, K, and S, of Docket Entry #111, as well as Ms. Uzzell's affidavit at Docket Entry #114, which the court does not consider.[37] Based on the exhibits that the court has considered (including McNesby's admissions and deposition testimony, the evidence regarding ECSO videotapes, and John Lee Sullivan's expert testimony), the court concludes that Salter has fallen short of meeting his burden of presenting "some evidence" showing that McNesby knew of a need to train and/or supervise in the area of the use of force by deputies, alone or in conjunction with K-9s, but elected not to take any action. See Gold, 151 F.3d at 1350; see also Wright v. Sheppard, 919 F.2d 665, 674 (11th Cir. 1990) (finding no liability of sheriff's department for failure to train where there was "no evidence of a history of widespread prior abuse" to put the sheriff on notice that improved training or supervision was needed).  Moreover, Mr. Sullivan's testimony is insufficient to show the likelihood of "constitutional violations was highly predictable so that liability attaches for this single incident." Gold, 151 F.3d at 1352. Indeed, "an expert's conclusory testimony does not control  . . .  [the] legal analysis of whether any need to train and/or supervise was obvious enough to trigger municipal liability without any evidence of prior incidents putting the municipality on notice of that need." Gold, 151 F.3d at  1352 n. 10.

---

37  Many of the stricken documents are related to those of Salter's exhibits which have been accepted into evidence; without the context provided by the stricken exhibits, however, many of the remaining exhibits have virtually no significance.  For example, without the evidence pertaining to Dix' alleged use of excessive force, which has been stricken, his employment records have no relevance to the issues in this case.

As previously discussed, even if the stricken exhibits had been taken into consideration, the court would find that the information contained in them is insufficient to create a genuine issue of fact as to whether McNesby fostered an official policy, custom, and practice of failure to train and supervise that resulted in the unlawful use of excessive force by his deputies.  Absent evidence that the cited incidents exceeded the "normal" number of incidents expected for the ECSO or had any statistical or other significance, Salter has not shown that McNesby had notice of a problem requiring additional training or supervision in the general area of the use of force, much less in the specific area of the use of K-9s, yet failed to take corrective action. See Thomas, 398 F.3d at 431. Additionally, none of the four or five incidents of alleged use of excessive force that Salter cites appears to involve the use of K-9s. See Gold, 151 F.3d at 1351.  Also, two of the stricken exhibits are internal affairs exhibits of investigations conducted into other allegations of the use of force; in both cases, the allegations were sustained and action was taken against the officers involved.  Moreover, McNesby's evidence supports a finding that he did not have notice of a problem regarding the use of force such that he should have taken remedial action, including that Jarman and Taylor have undergone extensive training as ECSO deputies in the areas of the use of force and use of K-9s; the ECSO has, and has enforced, a use of force policy and a use of K-9 policy that provide for review and remedial action by supervisory personnel when complaints or concerns about a deputy's performance arise; and no complaints or cases against the ECSO alleging the use of a K-9 constituted excessive force have been sustained.  McNesby's evidence also reflects that investigations into the events of February 11, 2005, were conducted and resulted in findings that neither Jarman nor Taylor acted improperly.  Salter's expert, John Lee Sullivan, testified that the investigation into the Las Javanas dance incident was "superficial" and a "whitewash" intended to shield McNesby and the deputies from liability. Mr. Sullivan's testimony is not sufficient to overcome Salter's failure to come forward with evidence on the issue of McNesby's notice of the need for additional training and/or supervision.  Mr. Sullivan's opinion, which is based on the single incident that occurred February 11, 2005,  does not create a triable issue of fact as to whether there existed within the ECSO a pervasive practice or custom that authorized or condoned the use of excessive force. See McDowell, 392 F.3d at 1290 (noting that isolated incidents generally do not create liability).

Salter must not only establish that the alleged deficiencies in training and

supervision are closely related to the ultimate injury but also that such deficiencies actually caused his injury. Salter simply has not produced evidence sufficient to create a triable issue of fact as to whether McNesby's use of force training was deficient or whether he did not adequately supervise deputies in the application of force.  Nor has Salter shown that such deficiencies resulted in any physical or emotional injuries suffered by Salter as a result of being struck in the mouth, hit on the head by a flashlight, or seized by the K-9.  See City of Canton, 489 U.S. at 391. In short, Salter has not demonstrated that McNesby was the "moving force" behind the events that occurred February 11, 2005, or the injuries of which he complains. Brown, 520 U.S. at 403.

The court concludes that for the reasons given Salter has failed to satisfy the high standard required by Monell, Brown, and City of Canton to hold McNesby responsible for any allegedly unlawful use of force by Jarman or Taylor under a theory of municipal liability.

Salter's argument that McNesby should be held liable on a theory of ratification likewise fails.  Salter contends that McNesby's admission that Taylor acted in accordance with ECSO policy when he ordered Awny to seize Salter renders McNesby liable.  It is true that to the extent McNesby explicitly approved Taylor's decision to deploy his K-9, it was on the premise that Taylor acted in accordance with ECSO policy.  This admission does not suggest, however, that McNesby approved any action by Taylor that did not accord with ECSO policy.  And, if a jury should find that Taylor used excessive force against Salter, such use of force would violate ECSO policy rather than comply with it.  Thus McNesby's admission is not evidence sufficient to support a claim based on ratification in this case. See St. Louis v. Praprotnik, 485 U.S. 112, 127 (U.S. 1988) (stating that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final"). To conclude otherwise would effectively result in assessing the municipality with liability pursuant to respondeat superior, "a result [the Supreme Court] rejected in Monell." Id. at 392. In short, the fact that Salter may have suffered a violation of his constitutional rights by Taylor permits no inference of culpability and causation that is attributable to McNesby. See McDowell, 392 F.3d at 1289 (citation omitted).

For all of the foregoing reasons, summary judgment as to Count II shall be entered in McNesby's favor.

## Count III: State Law – Intentional Battery Committed without Malice

Count III consists of a claim pled in the alternative against McNesby.  Salter asserts

that the conduct of Jarman and Taylor constitutes an intentional battery committed without malice for which McNesby may be held liable under the doctrine of respondeat superior. McNesby moves for summary judgment on the ground that Salter cannot establish liability on his claims against Jarman and Taylor for punitive damages without simultaneously establishing McNesby's entitlement to immunity in tort pursuant to § 768.28(9)(a).  Salter responds that if the evidence at trial establishes that Jarman and Taylor acted intentionally to injure him but did not act in bad faith or with a malicious purpose or in a manner exhibiting wanton and willful disregard for his safety or rights then McNesby could be liable for their actions.

As previously discussed, the State of Florida and its divisions are not liable in tort for the acts of an employee committed while the employee is acting outside the course and scope of his employment or committed in bad faith or with malicious purpose or wantonly or with willful disregard for human rights, safety, or property. Fla. Stat. § 768.28(9)(a). The employer can be liable, however, for the officer's intentional misconduct.  See McGhee, 679 So.2d at 733 (stating that "[t]he fact that [an officer] may have intentionally abused his office does not in itself shield the [employer] from liability" and explaining that "[i]n any given situation either the [governmental] agency can be held liable under Florida law, or the employee, but not both"). In McGhee the court explained

> Under Swenson [v. Cahoon, 111 Fla. 788, 152 So. 203 (1933)], a jury question as to the sheriff or employing agency's liability exists for acts of officers that can be described as abuses of lawful power. The employing agency is immune as a matter of law only if the acts are so extreme as to constitute a clearly unlawful usurpation of authority the deputy does not rightfully possess, Swenson, or if there is not even a pretense of lawful right in the performance of the acts. Craft v. John Sirounis & Sons, Inc., 575 So.2d 795 (Fla. 4th DCA  1991).

McGhee, 679 So.2d at 730.  The McGhee court went on to conclude that the defendant deputy in that case possessed the lawful official authority to restrain, detain, and use force in appropriate situations.  The fact that the defendant may have intentionally abused his office did not in itself shield the sheriff from liability. The court therefore determined that the question must be put to the factfinder as to whether, by allegedly grabbing the plaintiff by the throat and kicking him, the defendant acted in bad faith, with malicious purpose, or in a manner exhibiting wanton or willful disregard of human rights, safety, or property. Id.

This case involves allegations that Jarman and/or Taylor struck Salter in the face, hit him on the head with a flashlight, and commanded a K-9 to bite him during the course

of a seizure.  Such allegations arguably constitute conduct within the scope of the deputies' employment.  The question of whether, if the deputies committed the acts alleged, they did so "in bad faith, with malicious purpose, or in a manner exhibiting wanton or wilful disregard of human rights, safety, or property," potentially subjecting them to liability, or whether they committed the acts intentionally but without malice, potentially subjecting McNesby to liability, therefore should go to the jury. McGhee at 733; see also City of Homestead v. Suarez, 591 So.2d 1125, 1126 (Fla. 3d DCA 1992) (indicating that "arguably excessive force" to effect an arrest can present a jury question on an assault and battery claim against officer and municipality); Perkins v. City of Jacksonville Beach, 2007 WL 1796269 (M.D.Fla. 2007); Taylor v. Dean, 2007 WL 1469375 (M.D.Fla. 2007).  Accordingly, McNesby's motion for summary judgment is denied as to Count III of the complaint, and this claim shall proceed to trial.

## Count IV: State Law – Negligence

Salter alleges in Count IV of his complaint that Taylor and Jarman were negligent in arresting him and that McNesby is liable for such negligence under the doctrine of respondeat superior. McNesby contends that summary judgment should be granted as to this claim because Salter must, but has failed to, allege an act of negligence that is unrelated to the application of force during his arrest.  Salter responds that in fact he has asserted a distinct act of negligence, pointing to the allegation in his complaint that "Taylor and Jarman were negligent in ordering and allowing canine [Awny] to attack plaintiff Addison Salter without adequate warning, cause or provision for his safety and health." (Doc. 110 at 17).

Florida law does not permit a cause of action for "negligent use of excessive force." See City of Miami, 672 So.2d at, 47-48 ("it is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort").  Nevertheless,  "a separate negligence claim based upon a distinct act of negligence may be brought against a police officer in conjunction with a claim for excessive use of force."  Id. (citations omitted). "[T]he negligence component must pertain to something other than the actual application of force during the course of the arrest. It cannot serve as the exclusive basis for liability in an excessive force claim." Id.; see Lewis v. City of St. Petersburg, 260 F.3d 1260, 1263 (11th Cir. 2001) (noting that Florida recognizes cause of action for the negligent handling of a firearm and the negligent decision to use a firearm that is separate and distinct from an excessive force claim).

In this case, Salter attempts to characterize his allegation, quoted above, as pertaining to something other than the actual force applied during his seizure. The court does not read the allegation in this manner and Salter makes no attempt to explain why negligence allegedly involved in "ordering and allowing" the K-9 to seize him "without adequate warning, cause or provision for his safety and health" should be differentiated from the actual application of force through use of the K-9. In the court's view, there is no distinction. Accordingly, because the court concludes that Salter has not identified a cause of action in negligence distinct from his allegations of the use of force, his negligence claim fails.[38] McNesby's motion for summary judgment as to Count IV shall be granted.

### MOTION FOR SEPARATE TRIAL and MOTION FOR RECONSIDERATION

In their motion for separate trial, the defendants ask the court to bifurcate the trial of the individual claims against Jarman and Taylor from the municipal liability claim against McNesby, permitting the individual claims to go forward first. The defendants submit that if the jury determines that Jarman and Taylor committed no misconduct of constitutional dimension, the municipal liability claim against McNesby would be moot. Also, according to the defendants, bifurcation could help to avoid prejudice, promote convenience and efficiency, and expedite the proceedings. Salter opposes bifurcation.

A district court has the discretion to sever a Monell claim against a municipality from claims against individual police officers and stay litigation of the Monell claim until the rest of the case is resolved. See Wilson v. Morgan, 477 F.3d 326, 339 (6th Cir. 2007); Treece v. Hochstetler, 213 F.3d 360, 364 (7th Cir. 2000); Amato v. City of Saratoga Springs, 170 F.3d 311, 316 (2d Cir. 1999); Quintanilla v. City of Downey, 84 F.3d 353, 356 (9th Cir. 1996). In this case, because the court has granted summary judgment in McNesby's favor on Salter's Monell claim, there is no reason to bifurcate individual liability from municipal liability. The motion for separate trial therefore shall be denied.

Salter also seeks reconsideration of the magistrate judge's order dated April 24, 2007, directing Salter to reimburse the defendants for certain copying and redaction costs. (Doc. 149). As the order is not clearly erroneous or contrary to law, the motion is denied.

---

38  Salter also contends in his response that a genuine issue of fact exists regarding whether McNesby negligently investigated the Las Javanas dance incident, including the handling of evidence of the cruiser videotapes. This argument strays far afield from the allegation in Count IV that Jarman and Taylor were negligent and that McNesby is liable for their negligence based on a theory of respondeat superior. The court therefore declines to address Salter's contention.

<u>See</u> 28 U.S.C. § 636(b)(1)(B).

## CONCLUSION

For the reasons stated above, the defendants' motion to strike is granted.  Jarman's motion for summary judgment as to Count I is denied in part and granted in part; as to Count III the motion is denied.  McNesby's motion for summary judgment is granted as to Counts II and IV and denied as to Count III. The defendants' motion for separate trial is denied and the motion for reconsideration is also denied.

Accordingly, it is hereby ORDERED:

1.      The motion to strike (doc. 117) is GRANTED.

2.      The motion for summary judgment filed by defendant Jeremy Jarman (doc. 60) is DENIED in part and GRANTED in part:

      a.      As to Salter's claim of the use of excessive force in Count I, the motion is DENIED.

      b.      As to Salter's claim of failure to intervene in the use of excessive force in Count I, the motion is GRANTED.

      c.      As to Count III, the motion is DENIED.

3.      The motion for summary judgment filed by defendant Ron McNesby (doc. 102) is GRANTED in part and DENIED in part:

      a.      As to Counts II and IV, the motion is GRANTED.

      b.      As to Count III, the motion is DENIED.

4.      The motion for separate trial (doc. 115) is DENIED.

5.      The motion to reconsider the magistrate judge's order of April 24, 2007 (doc. 152) is DENIED.

6.      The clerk shall SEAL Docket Entries # 65 (Exhibit E only); # 69, and # 70.

7.      The clerk of court shall defer entering summary judgment as set forth above until the conclusion of the entire case.

DONE and ORDERED this 24th day of August, 2007.

s/ *M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**